1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   FELIX PEREZ, an individual, on his own            No.  1:19-cv-00449-DAD-BAM
     behalf and on behalf of all others similarly
12   situated,

13              Plaintiff,                              ORDER GRANTING FINAL APPROVAL OF
                                                        CLASS ACTION SETTLEMENT AND
14        v.                                            AWARDING ATTORNEYS' FEES, COSTS,
                                                        AND INCENTIVE AWARD
15   CVS HEALTH CORPORATION, et al.,
                                                        (Doc. Nos. 71, 72, 73)
16              Defendants.

17

18        This matter came before the court on June 7, 2021 for a hearing on the unopposed motions

19   for final approval of a class action settlement, for an award of attorneys' fees and costs, and for an

20   incentive award for plaintiff, filed on behalf of plaintiff Felix Perez on May 10, 2021.  (Doc. Nos.

21   71, 72, 73.)  Attorney Michael Bradley appeared on behalf of plaintiff and the settlement class.

22   Attorney Jennifer Zargarof appeared on behalf of defendants CVS Health Corporation and CVS

23   Pharmacy Inc. (collectively, "CVS" or "defendants").  For the reasons set forth below, the court

24   will grant the final approval of the class action settlement and will award attorneys' fees, costs,

25   and incentive payments.

26                                    **BACKGROUND**

27        The court previously granted preliminary approval of the settlement in this action on

28   December 23, 2020, when it adopted the findings and recommendations of the assigned

                                            1

1    magistrate judge.  (Doc. No. 70.)  Pertinent factual details may be found in those findings and

2    recommendations and will not be repeated here.  (*See* Doc. No. 66.)

3         Plaintiff filed this putative class action in Stanislaus County Superior Court on January 16,

4    2019, alleging that his employer CVS violated several provisions of the California Labor Code by

5    not compensating him and other distribution center employees for the time they spent waiting to

6    undergo security checks of their personal bags at the beginning and end of their shifts and when

7    they left and returned from meal and rest breaks.  (Doc. No. 1-3 at 10–12, 14.)  On April 5, 2019,

8    defendants removed this case to this federal court.  (Doc. No. 1.)

9         On March 12, 2020, defendants filed a notice of settlement (Doc. No. 27) and on May 14,

10   2020, plaintiff filed a motion for preliminary approval of the parties' class action settlement (Doc.

11   No. 41).  However, due to concerns that plaintiff had not sufficiently established the basis for the

12   court's subject matter jurisdiction over this action in his second amended complaint or his

13   proposed third amended complaint, the court ordered plaintiff to show cause why this case should

14   not be dismissed for lack of subject matter jurisdiction.  (Doc. No. 52.)  The court also denied

15   plaintiff's motion for preliminary approval without prejudice to its refiling.  (*Id.* at 7.)  Thereafter,

16   the parties each filed a response addressing the court's concerns (Doc. Nos. 53, 54), and on June

17   19, 2020, the court discharged the order to show cause and directed plaintiff to file a third

18   amended complaint with corrected jurisdictional allegations.  (Doc. No. 55.)  On June 24, 2020,

19   plaintiff filed the operative third amended complaint, in which plaintiff added a claim under the

20   Private Attorney General Act ("PAGA"), California Labor Code §§ 2698 *et seq.*  (Doc. No. 56 at

21   1, 29.)

22        On May 10, 2021, plaintiff filed the pending renewed motion for final approval of the

23   parties' class action settlement (Doc. No. 71), motion for attorneys' fees and costs (Doc. No. 72),

24   and motion for an incentive award for plaintiff (Doc. No. 73).  As of the filing of plaintiff's

25   pending motions, no class members have requested exclusion from the settlement or objected to

26   the settlement.  (Doc. No. 71-1 at 11–12.)  As of the final approval hearing on June 7, 2021, no

27   objections to the settlement have been received or filed with the court.  Moreover, no class

28   members appeared at the final approval hearing.

2

### FINAL CERTIFICATION OF SETTLEMENT CLASS

In adopting the findings and recommendations recommending preliminary approval of the parties' class action settlement, the court concluded that the magistrate judge properly analyzed the class certification factors and found certification warranted. (Doc. No. 70.) Because no additional issues concerning class certification have been raised, the court finds no basis to revisit any of that analysis. The court finds that final class certification in this case is appropriate.

The following class of an estimated 3,515 employees (the "Class Members") is therefore certified for settlement purposes:

> All CVS non-exempt employees who worked in California distribution centers between January 16, 2015 and August 15, 2020 inclusive (the "Class Period").

(Doc. Nos. 58-1 at 2–3; 66 at 2–3; 70 at 2.)

In addition, and for the reasons stated in the findings and recommendations (Doc. No. 66 at 4), plaintiff Felix Perez is confirmed as the class representative, attorneys Marcus J. Bradley and Kiley Grombacher of the law firm Bradley Grombacher, LLP are confirmed as class counsel, and ILYM Group, Inc. ("ILYM") is confirmed as the settlement administrator.

### FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Class actions require the approval of the district court prior to settlement. Fed. R. Civ. P. 23(e). Federal Rule 23 requires the district court to determine whether a proposed settlement is fundamentally fair, adequate, and reasonable. *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) (citing *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)). The settlement as a whole, rather than the individual component parts, is examined for overall fairness. *Hanlon,* 150 F.3d at 1026.

To approve a settlement, a district court must:  (i) ensure notice is sent to all class members; (ii) hold a hearing and make a finding that the settlement is fair, reasonable, and adequate; (iii) the parties seeking approval file a statement identifying the settlement agreement; and (iv) class members be given an opportunity to object. Fed. R. Civ. P. 23(e)(1)–(5). The amended settlement agreement in this action was previously filed on the court's docket (*see* Doc.

1   No. 74, Ex. 1), and class members have been given an opportunity to object thereto but, as noted,

2   none have done so.  The court now turns to the adequacy of notice and its review of the

3   settlement following the final fairness hearing.

4   **A.   Notice**

5         "Adequate notice is critical to court approval of a class settlement under Rule 23(e)."

6   *Hanlon*, 150 F.3d at 1025; *see also Silber v. Mabon*, 18 F.3d 1449, 1453–54 (9th Cir. 1994)

7   (noting that the court need not ensure all class members receive actual notice, only that "best

8   practicable notice" is given); *Winans v. Emeritus Corp.*, No. 13-cv-03962-HSG, 2016 WL

9   107574, at *3 (N.D. Cal. Jan. 11, 2016) ("While Rule 23 requires that 'reasonable effort' be made

10  to reach all class members, it does not require that each individual actually receive notice.").

11  "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to

12  alert those with adverse viewpoints to investigate and to come forward and be heard.'"  *Churchill*

13  *Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (quoting *Mendoza v. Tucson Sch.*

14  *Dist. No. 1*, 623 F.2d 1338, 1352 (9th Cir. 1980)).  Any notice of the settlement sent to the class

15  should alert class members of "the opportunity to opt-out and individually pursue any state law

16  remedies that might provide a better opportunity for recovery."  *Hanlon*, 150 F.3d at 1025.  It is

17  important for class notice to include information concerning the attorneys' fees to be awarded

18  from the settlement because it serves as "adequate notice of class counsel's interest in the

19  settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 963 n.15 (9th Cir. 2003) (quoting *Torrisi v.*

20  *Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993)) (noting that where the notice

21  references attorneys' fees only indirectly, "the courts must be all the more vigilant in protecting

22  the interests of class members with regard to the fee award").

23         Here, the court reviewed the class notice that was proposed when the parties sought

24  preliminary approval of the settlement and found it to be inadequate because it lacked meaningful

25  information about the terms of the settlement, such as the amount plaintiff would seek from the

26  court for an award of attorneys' fees and costs, and because there were inconsistent references to

27  a settlement website.  (Doc. No. 68.)  Thus, the court directed the parties to file supplemental

28  briefing to address the court's concerns, and the parties did so on December 21, 2020.  (Doc. No.

69.)  Plaintiff attached a revised class notice as an exhibit to class counsel's declaration in support of the parties' supplemental brief.  (Doc. No. 69-1 at 6–14.)  Thereafter, the court reviewed that revised class notice and found it to be adequate.  (Doc. No. 70.)

Following the grant of preliminary approval, counsel for defendants provided the settlement administrator ILYM with the last known mailing addresses for each of the 3,515 proposed class members.  (Doc. Nos. 71-1 at ¶ 5.)  ILYM then conducted a National Change of Address search to update the list of proposed class members with current addresses and mailed the court-approved notice packet to each of the 3,515 proposed class members.  (*Id.* at ¶¶ 6–7.)  Of the 3,515 initial mailings, 139 were returned as undeliverable.  (*Id.* at ¶ 8.)  Of those 139 returned notice packets, 2 were returned with a forwarding address and ILYM states that they promptly re-mailed the notice packet to those forwarding addresses.  (*Id.*)  ILYM performed a computerized skip trace on the 137 notice packets returned without a forwarding address to locate an updated address for each, and they were able to do so for 104 of them and re-mailed notice packets to those updated addresses.  (*Id.*)  As of May 10, 2021, a total of 33 notice packets have been deemed undeliverable because the administrator was unable to find a deliverable address.  (*Id.* at ¶ 10.)  Thus, of the 3,515 total class members, 3,482 proposed class members, or 99%, are estimated to have received actual notice of the settlement.

Given the above, the court concludes that adequate notice was provided to the class here.  *See Silber v. Mabon*, 18 F.3d 1449, 1453–54 (9th Cir. 1994) (courts need not ensure all class members receive actual notice, only that "best practicable notice" is given); *Winans v. Emeritus Corp.*, No. 13-cv-03962-HSG, 2016 WL 107574, at *3 (N.D. Cal. Jan. 11, 2016) ("While Rule 23 requires that 'reasonable effort' be made to reach all class members, it does not require that each individual actually receive notice.").  The court accepts the reports of the settlement administrator and finds that sufficient notice has been provided satisfying Rule 23(e)(1).

**B.    Final Fairness Determination**

On June 7, 2021, the court held a final fairness hearing, at which class counsel and defense counsel appeared by video conferencing.  No class members, objectors, or counsel representing the same appeared at that hearing.  For the reasons explained below, the court now

5

1  determines that the settlement reached in this case is fair, adequate, and reasonable.  *See* Fed. R.

2  Civ. P. 23(e)(2).

3      At the final approval stage, the primary inquiry is whether the proposed settlement "is

4  fundamentally fair, adequate, and reasonable."  *Lane v. Facebook, Inc.*, 696 F.3d 811, 818 (9th

5  Cir. 2012); *Hanlon*, 150 F.3d at 1026.  "It is the settlement taken as a whole, rather than the

6  individual component parts, that must be examined for overall fairness."  *Hanlon*, 150 F.3d at

7  1026 (citing *Officers for Justice v. Civil Serv. Comm'n of S.F.*, 688 F.2d 615, 628 (9th Cir.

8  1982)); *see also Lane*, 696 F.3d at 818–19.  Having already completed a preliminary examination

9  of the agreement, the court reviews it again, mindful that the law favors the compromise and

10  settlement of class action suits.  *See, e.g.*, *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th

11  Cir. 2008); *Churchill Vill., L.L.C.*, 361 F.3d at 576; *Class Plaintiffs v. City of Seattle*, 955 F.2d

12  1268, 1276 (9th Cir. 1992); *Officers for Justice*, 688 F.2d at 625.  Ultimately, "the decision to

13  approve or reject a settlement is committed to the sound discretion of the trial judge because he

14  [or she] is exposed to the litigants and their strategies, positions, and proof."  *Staton*, 327 F.3d at

15  953 (quoting *Hanlon*, 150 F.3d at 1026).

16      In assessing the fairness of a class action settlement, courts balance the following factors:

17      (1) the strength of the plaintiffs' case; (2) the risk, expense,
complexity, and likely duration of further litigation; (3) the risk of

18      maintaining class action status throughout the trial; (4) the amount
offered in settlement; (5) the extent of discovery completed and the

19      stage of the proceedings; (6) the experience and views of counsel;
(7) the presence of a governmental participant; and (8) the reaction

20      of the class members to the proposed settlement.

21  *Churchill Vill., L.L.C.*, 361 F.3d at 575; *see also In re Online DVD-Rental Antitrust Litig.*, 779

22  F.3d 934, 944 (9th Cir. 2015); *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 964–67 (9th Cir.

23  2009).  These settlement factors are non-exclusive, and each need not be discussed if they are

24  irrelevant to a particular case.  *Churchill Vill., L.L.C.*, 361 F.3d at 576 n.7.

25      Where the parties have reached a settlement agreement prior to class certification, the

26  court has an independent duty on behalf of absent class members to be vigilant for any sign of

27  collusion among the negotiating parties.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654

28  F.3d 935, 946 (9th Cir. 2011) (noting "settlement class actions present unique due process

6

concerns for absent class members" because the "inherent risk is that class counsel may collude with the defendants, 'tacitly reducing the overall settlement in return for a higher attorney's fee'") (citations omitted).  In particular, where a class action settlement agreement is reached prior to a class being certified by the court, "consideration of these eight *Churchill* factors alone is not enough to survive appellate review." *Id.* at 946–47.  District courts must be watchful "not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* at 947.  These more subtle signs include:  (i) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded"; (ii) the existence of a "clear sailing" arrangement, which provides "for the payment of attorneys' fees separate and apart from class funds," and therefore carries "the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class"; and (iii) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Id.* (internal quotations and citations omitted).  The Ninth Circuit has also recognized that a version of a "clear sailing" arrangement exists when a defendant expressly agrees not to oppose an award of attorneys' fees up to an agreed upon amount. *Lane*, 696 F.3d at 832; *In re Bluetooth*, 654 F.3d at 947; *In re Toys R Us-Delaware, Inc.–Fair and Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 458 (C.D. Cal. 2014) ("In general, a clear sailing agreement is one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling.") (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 520 n.1 (1st Cir. 1991)).

While this court has wide latitude to determine whether a settlement is substantively fair, it is held to a higher procedural standard and "must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections." *Allen v. Bedolla*, 787 F.3d 1218, 1223–24 (9th Cir. 2015) (quoting *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012)).  Thus, while the court should examine any relevant *Churchill* factors, the failure to review

/////

a pre-class certification settlement for those subtle signs of collusion identified above may constitute error. *Id.* at 1224–25.

   1. <u>Strength of Plaintiff's Case</u>

  When assessing the strength of a plaintiff's case, the court does not reach "any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of th[e] litigation." *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1388 (D. Ariz. 1989). The court cannot reach such a conclusion because evidence has not been fully presented. *Id.* Instead, the court "evaluate[s] objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Id.*

  Here, plaintiff states that while he remained "confident in, and committed to, the merits of the case throughout the litigation and settlement process, [he] was realistic regarding the risks at each stage going forward." (Doc. No. 71 at 18–19.) Plaintiff notes that the parties would have engaged in lengthy and complex motion practice, including for class certification and summary judgment, and would likely appeal those rulings, all of which would have delayed recovery for a class of "modest wage workers for whom receiving speedy remuneration is particularly important." (*Id.* at 19.) Plaintiff also noted that without evidence that defendants' policies were unlawful on their face, this case was particularly risky because it would be difficult to demonstrate manageability based on evidence of an unlawful "pattern and practice" and to prove those claims at trial. (*Id.*) Further, class counsel asserts that in their experience litigating these type of claims—based on a defendant's pattern and practice rather than facially unlawful policies—a plaintiff faces significant difficulties in proving the merits of those claims. (Doc. No. 72 at 8.) In addition, class counsel argues that even if plaintiff prevailed on liability for the PAGA claim, "the measure of penalties still would have been hotly contested and presented further risk." (Doc. No. 71 at 19.) Thus, class counsel contends that the uncertainty and potential risks attendant further litigation weigh in favor of granting final approval of this settlement. (*Id.* at 18.)

/////

8

1    Therefore, it appears that while plaintiff may have meritorious claims on a class-wide

2    basis, it is far from certain that he would have prevailed on those claims or achieved full recovery

3    on each or any of them.  The court finds that consideration of this factor weighs in favor of

4    granting final approval of the settlement in this action.

5              2.         Risk, Expense, Complexity, and Likely Duration of Further Litigation

6    "[T]here is a strong judicial policy that favors settlements, particularly where complex

7    class action litigation is concerned."  *In re Syncor ERISA Litig.*, 516 F.3d at 1101 (citing *Class*

8    *Plaintiffs*, 955 F.2d at 1276).  As a result, "[a]pproval of settlement is preferable to lengthy and

9    expensive litigation with uncertain results."  *Johnson v. Shaffer*, No. 2:12-cv-1059-KJM-AC,

10   2016 WL 3027744, at *4 (E.D. Cal. May 27, 2016) (citing *Morales v. Stevco, Inc.*, No. 1:09-cv-

11   00704-AWI-JLT, 2011 WL 5511767, at *10 (E.D. Cal. Nov. 10, 2011)).  Employment law class

12   actions are, by their nature, time-consuming and expensive to litigate.  *Hightower v. JPMorgan*

13   *Chase Bank, N.A.*, No. 11-cv-1802-PSG-PLA, 2015 WL 9664959, at *6 (C.D. Cal. Aug. 4, 2015).

14   Though the parties have been litigating this case for only two-and-a-half years, class

15   counsel asserts that "[p]roceeding to trial (and the inevitable appeals) could add many more years

16   to the resolution of this case," and "the road to success in this case was far from certain."  (Doc.

17   No. 71 at 18.)  Class counsel also note that given the nature of this case, the number of disputed

18   issues, and the fact that this case has not yet proceeded to the class certification stage, there is

19   potential for many years of delay, especially if defendants appeal any of the court's

20   determinations on class certification, liability, evidentiary rulings, and penalty calculations.  (*Id.*

21   at 19.)  Though plaintiff did not address the potential expense of further litigation in his motion, at

22   the final approval hearing, class counsel noted that litigating this case to a final resolution would

23   have required significant investments of both time and expenses, absent a settlement, particularly

24   because several class members from different shifts would need to be deposed to provide their

25   accounts of how much time they spent undergoing security checks.  Thus, consideration of this

26   factor also weighs in favor of granting final approval.

27   /////

28   /////

9

3.    Amount Offered in Settlement

To evaluate the fairness of the settlement award, the court should "compare the terms of the compromise with the likely rewards of litigation." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968).  "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not *per se* render the settlement inadequate or unfair." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).  To determine whether a settlement "falls within the range of possible approval" a court must focus on "substantive fairness and adequacy," and "consider plaintiffs' expected recovery balanced against the value of the settlement offer." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007).

Here, the parties have agreed to non-reversionary settlement of $1,850,000 (the "gross settlement amount").  (Doc. No. 71 at 8.)  The settlement agreement provides for allocation of the gross settlement fund as follows:  (1) payment for attorneys' fees in the amount of $616,666.67, which is one-third of the gross settlement fund; (2) class counsel's litigation expenses in the amount of $8,763.80; (3) pursuant to PAGA, payment to the Labor and Workforce Development Agency ("LWDA") in the amount of $75,000 and payment to the subset of Class Members who worked during the PAGA Period ("PAGA Employees") of $25,000; (4) settlement administration costs estimated to be $30,000.00; (5) incentive award of $10,000 to plaintiff Perez; and (6) distribution to the class members in the amount of the remaining funds, estimated to be $1,084,569.53 (the "net settlement amount").  (Doc. Nos. 71 at 8–9; 71-7 at ¶¶ 15–16.)  Each individual class member's share of the net settlement amount will be proportional to the number of weeks worked during the applicable time period in comparison to the aggregate number of weeks worked by all Class Members during that period.  (Doc. No. 71 at 9.)  The settlement administrator estimates that the average gross payment to Class Members will be $315.67 and the highest gross payment will be $768.41.  (Doc. No. 71-1 at ¶ 15.)  None of the settlement funds will revert to defendants; the settlement agreement provides that any funds from uncashed checks will be transmitted to the State Controller's Office under the Unclaimed Property Law Statutes. (Doc. No. 58-1 at 17.)

1    Plaintiff argues that the amount offered in this settlement is reasonable and that the totality

2    of the relief provided to the class is well within the range of reasonableness.  Plaintiff contends

3    that the average recoveries for Class Members "compare favorably to wage-and-hour class action

4    settlements in California." (Doc. No. 71 at 18) (citing cases).  In addition, class counsel explain

5    that they prepared an exposure analysis after they vetted plaintiff's claim through rigorous legal

6    analysis, evaluated employment data of a representative sample of the class, and interviewed a

7    122 current and former putative class members.  (Doc. No. 71 at 16–17.)  However, class counsel

8    did not provide their estimate of the maximum potential damages in their motion for final

9    approval.  In his motion for preliminary approval, plaintiff stated that the total exposure on his

10   core non-PAGA claims was approximately $76,000,000.  (Doc. No. 57 at 27–32.)  Thus, the

11   settlement amount of $1,850,000 represents approximately 2.5% of the class's potential

12   maximum recovery as estimated by plaintiff.  This settlement amount is not per se unreasonable,

13   and district courts in California have found similarly low percentage recoveries under some

14   circumstances to be reasonable for this purpose.  *See, e.g.*, *Balderas v. Massage Envy*

15   *Franchising, LLC*, No. 12-cv-06327-NC, 2014 WL 3610945, at *5 (N.D. Cal. July 21, 2014)

16   (settlement of approximately 5 percent found to be preliminarily fair); *Maciel et al., v. Bar 20*

17   *Dairy, LLC*, No. 1:17-cv-00902-DAD-SKO, 2021 WL 1813177, at *6 (E.D. Cal. May 6, 2021)

18   (settlement of approximately 3 percent found to be fair and adequate).  The court has previously

19   assessed the fairness and adequacy of the settlement amount, in light of the circumstances of this

20   case, and found a 2.5 percent recovery rate to be reasonable even though it is at the low end of the

21   range of percentage recoveries.  In addition, the approximated value of $76 million consists of the

22   maximum amount of damages for every possible labor code violation, including stacked damages

23   for the PAGA claims, and does not account for any discounts or give any weight to the defenses

24   presented by the defendants.  (*Id.*)  At the final approval hearing, class counsel argued that

25   settlement of the class claims for a discounted amount is appropriate given that individual class

26   members spent a *de minimis* amount of uncompensated time undergoing security checks (e.g., 30

27   seconds per security check).

28   /////

1    The court finds that the settlement amount in this case is appropriate and fair.  Thus,

2    consideration of this factor also weighs in favor of final approval.

3              *a.        PAGA Penalties Amount Offered in Settlement*

4        The settlement also provides for $100,000.00 in civil PAGA penalties.  (Doc. No. 71 at 8–

5    9.)  Pursuant to PAGA, 75% of the civil penalties, or $75,000.00, will go to the LWDA, and 25%,

6    or $25,000.00, will be included in the net settlement amount.  (*Id.*)  *See* Cal. Lab. Code § 2699(i).

7        In the class action context, where PAGA claims are also often brought, a district court

8    must independently determine that a proposed settlement agreement is "fundamentally fair,

9    adequate and reasonable" before granting approval.  *See Officers for Justice v. Civil Serv.*

10   *Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982); *see also In re*

11   *Heritage Bond Litigation*, 546 F.3d 667, 674–75 (9th Cir. 2008).  The LWDA has provided some

12   guidance regarding court approval of PAGA settlements.  *See* California Labor and Workforce

13   Development Agency's Comments on Proposed PAGA Settlement ("LWDA Comments");

14   *O'Connor v. Uber Techs., Inc.*, No. 3:13-cv-03826-EMC, Doc. No. 736 at 2–3, (N.D. Cal. Jul. 29,

15   2016).  In *O'Connor*, where both class action and PAGA claims were covered by a proposed

16   settlement, the LWDA stressed that

17              It is [] important that when a PAGA claim is settled, the relief
              provided for under the PAGA be genuine and meaningful,
18              consistent with the underlying purpose of the statute to benefit the
              public and, in the context of a class action, [it is important that] the
19              court evaluate whether the settlement meets the standards of being
              "fundamentally fair, reasonable, and adequate" with reference to
20              the public policies underlying the PAGA.

21   *Id.*

22       The proposed $100,000.00 penalty payment in this case represents approximately 5.2% of

23   the estimated $1.85 million gross settlement amount and will be allocated across the subset of

24   Class Members who worked during the PAGA Period.  Judges of this court have previously

25   approved comparable PAGA penalties in other class actions.  *See Syed v. M-I, L.L.C.*, No. 1:12-

26   cv-01718-DAD-MJS, 2017 WL 714367, at *13 (E.D. Cal. Feb. 22, 2017) (approving $100,000

27   PAGA penalty for a California class with a $3.95 million gross settlement payment); *Garcia v.*

28   *Gordon Trucking, Inc.*, No. 1:10-cv-0324-AWI-SKO, 2012 WL 5364575, at *7 (E.D. Cal. Oct.

31, 2012) (approving $10,000 PAGA penalty for a California class with a $3.7 million gross

settlement payment).  Having reviewed the parties' submission and the terms of the proposed

settlement, the court finds that the settlement amount related to plaintiff's PAGA claims is fair,

reasonable, and adequate in light of the public policy goals of PAGA.

Because of the concrete risks attendant with the pursuit of further litigation in this action

articulated above, the court finds that the amount offered in settlement of the PAGA claims here

weighs in favor of final approval of the settlement.

4.    Extent of Discovery Completed and Stage of the Proceedings

"In the context of class action settlement, 'formal discovery is not a necessary ticket to the

bargaining table' where the parties have sufficient information to make an informed decision

about settlement." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998)

(quoting *In re Chicken Antitrust Litig.*, 669 F.2d 228, 241 (5th Cir. 1982)).  Approval of a class

action settlement thus "is proper as long as discovery allowed the parties to form a clear view of

the strength and weaknesses of their case." *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D.

443, 454 (E.D. Cal. 2013).  A settlement is presumed fair if it "follow[s] sufficient discovery and

genuine arms-length negotiation." *Adoma v. Univ. of Phx., Inc.*, 913 F. Supp. 2d 964, 977 (E.D.

Cal. 2012) (quoting *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D.

Cal. 2004)).  The court must consider whether the process by which the parties arrived at their

settlement is truly the product of arm's length bargaining, rather than collusion or fraud.  *Millan

v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).

Here, the plaintiff asserts that "[t]he settlement was reached after informed, arms-length

settlement negotiations supervised by a well-respected mediator experienced in wage-and-hour

class action cases, Lisa Klerman." (Doc. No. 71 at 16.)  Before the mediation on January 17,

2020, class counsel evaluated class data provided by the defendants, which showed the class size,

workdays, and pay periods, and used that data to prepare an exposure analysis.  (*Id.*)  Class

counsel also conducted interviews with approximately two dozen putative class members from a

random sampling of 122 putative class members to discuss their experience with security checks

and other working conditions at the CVS distribution centers.  (*Id.* at 16–17.)  After conducting

1   that extensive investigation, the parties participated in a day-long mediation, and those

2   negotiations were rigorous.  (*Id.* at 17.)  Based on these representations, the court concludes that

3   the parties' negotiations, which resulted in their settlement, constituted genuine, informed, arm's

4   length bargaining.

5         Accordingly, the court concludes that consideration of this factor also weighs in favor of

6   granting final approval of the settlement.

7         5.      Experience and Views of Counsel

8         Class counsel Marcus J. Bradley has filed a declaration in support of the pending motion

9   for final approval and motion for attorneys' fees, detailing his firm's extensive experience in

10  litigating wage and hour class actions and explaining why this settlement is fair and reasonable in

11  the view of class counsel.  (Doc. No. 72-1 at ¶¶ 35–51.)  Based on their experience and

12  qualifications, specifically their experience litigating and settling class actions with security check

13  related claims, class counsel has concluded that this settlement is fair and reasonable.  (Doc. No.

14  71 at 17.)  Thus, consideration of class counsel's experience and expressed opinions in this regard

15  also weighs in favor of final approval of the settlement.

16        6.      Presence of a Governmental Participant

17        The settlement agreement contemplates payment of $100,000 of the settlement amount to

18  the  LWDA under PAGA.  (Doc. Nos. 71 at 9–10; 58-1 at 4–6, 11.)  This too weighs in favor of

19  approval of the settlement.  *See Adoma v. Univ. of Phx. Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal.

20  2012); *Zamora v. Ryder Integrated Logistics, Inc.*, No. 13-cv-2679-CAB-BGS, 2014 WL

21  9872803, at *10 (S.D. Cal. Dec. 23, 2014) (factoring civil PAGA penalties as being in favor of

22  settlement approval).

23        7.      Reaction of the Class Members

24        The absence of objections to a proposed class action settlement supports the conclusion

25  that the settlement is fair, reasonable, and adequate.  *See Nat'l Rural Telecomms. Coop.*, 221

26  F.R.D. at 529 ("The absence of a single objection to the Proposed Settlement provides further

27  support for final approval of the Proposed Settlement.") (citing cases); *Barcia v. Contain-A-Way,*

28  *Inc.*, No. 07-cv-938-IEG-JMA, 2009 WL 587844, at *4 (S.D. Cal. Mar. 6, 2009).

According to the declaration of Nathalie Hernandez, Operations Manager for ILYM, who serves as the settlement administrator in this case, no member of the class has filed an objection to the settlement pending before the court for final approval and no member of the class requested to be excluded from the settlement.  (Doc. No. 71-1 at ¶¶ 11–12.)  Similarly, no class members appeared at the final fairness hearing to raise any objections to the settlement.  Accordingly, consideration of this factor weighs significantly in favor of granting final approval.

        8.     Subtle Signs of Collusion

The court now turns to a review of whether any of the "more subtle signs" of collusion recognized by the Ninth Circuit are present here.  *See In re Bluetooth*, 654 F.3d at 947.

First, the court does not find that class counsel is seeking a disproportionate distribution of the settlement even though the amount of attorneys' fees sought here—one-third of the settlement fund—is on the high end of amounts typically awarded in the Ninth Circuit.  *See Id.* (setting a 25% benchmark); *Staton*, 327 F.3d at 952 (same); *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (same); *see also Morales v. Stevco, Inc.*, No. 1:09-cv-00704-AWI-JLT, 2011 WL 5511767, at *12 (E.D. Cal. Nov. 10, 2011) ("The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark.") (quoting *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000)).

Second, the settlement includes a version of a "clear sailing" arrangement, in which defendants agreed not to oppose plaintiff's request for a maximum award of $616,666.67 in attorneys' fees.  (Doc. No. 58-1 at 10.)  Although the "very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class," *In re Bluetooth*, 654 F.3d at 948 (citation omitted), the existence of a clear sailing provision is not necessarily fatal to final approval.  Rather, "when confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class."  *Id.* (citing *Staton*, 327 F.3d at 954).  Plaintiff argues that "an award of one-third of the common fund is reasonable and warranted in light of the contingency risk and difficulty of the representation here, as well as the

15

excellent result achieved." (Doc. No. 72 at 15.)  In particular, plaintiff notes that the recovery for class members in this action ($315.67 on average, with $768.41 as the highest payment) compare favorably to other class action settlements in wage and hour cases, which provided average recoveries in the range of $90–$155.  (Doc. No. 72 at 16.)  Plaintiff emphasizes that these individual recoveries "will bring meaningful relief to the Class, who are modest wage workers subjected to security checks off-the-clock." (*Id.*)  In addition, the court notes that none of the class members objected to this settlement or requested to be excluded from the settlement.

Third, the parties did not arrange for any unawarded amount of fees to revert to defendants.  According to the parties' settlement agreement, any funds remaining from uncashed checks will be transmitted to the State Controller's Office under the Unclaimed Property Law Statutes.  (Doc. No. 58-1 at 17.)

Therefore, the court is satisfied that the parties' settlement in this action is not the product of collusion.

In sum, after considering all of the relevant factors, the court finds on balance that the settlement is fair, reasonable, and adequate.  *See* Fed. R. Civ. P. 23(e).  Thus, the court will grant plaintiff's motion for final approval of the parties' class action settlement.

## ATTORNEYS' FEES, COSTS, AND INCENTIVE PAYMENTS

Plaintiff has also separately filed a motion seeking awards of attorneys' fees, class counsel's litigation expenses, and settlement administrator costs to ILYM (Doc. No. 72) and a motion for an incentive award for plaintiff Perez (Doc. No. 73).

### A.    Attorneys' Fees

This court has an "independent obligation to ensure that the award [of attorneys' fees], like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth*, 654 F.3d at 941.  This is because, when fees are to be paid from a common fund, the relationship between the class members and class counsel "turns adversarial." *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010); *In re Wash. Pub. Power Supply Sys. Secs. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994).  As such, the district court assumes a fiduciary role for the class members in evaluating a request for an award of attorneys' fees from

16

the common fund.  *In re Mercury*, 618 F.3d at 994; *see also Rodriguez v. Disner*, 688 F.3d 645, 655 (9th Cir. 2012); *West Publ'g Corp.*, 563 F.3d at 968.

In a diversity action such as this, federal courts apply state law both to determining the right to fees and the method of calculating them.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *Mangold v. Cal. Public Utils. Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995). The California Supreme Court has clarified that the percentage-of-fund method of calculating attorneys' fees remains appropriate under California law.  *Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 503–06 (2016).  Thus, under California law a court "may determine the amount of a reasonable fee by choosing an appropriate percentage of the fund created."  *Id.* at 503.  The California Supreme Court also suggested that considerations of the risks and potential value of the litigation, the contingency, novelty, and difficulty of the litigation, the skill shown by counsel, and a lodestar cross-check are all appropriate means of discerning an appropriate percentage award in a common fund case.  *Id.* at 504.  Notably, while the California Supreme Court has recognized the Ninth Circuit's 25 percent benchmark for percentage awards in common fund cases, it did not adopt such a benchmark under California law.  *Id.* at 495, 503–06.  In common fund percentage award cases, the Ninth Circuit has similarly provided a non-exhaustive list of factors to be considered in assessing the reasonableness of the award, including:

> the extent to which class counsel achieved exceptional results for the class, whether the case was risky for class counsel, whether counsel's performance generated benefits beyond the cash settlement fund, the market rate for the particular field of law (in some circumstances), the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work), and whether the case was handled on a contingency basis.

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 954–55 (quoting *Vizcaino*, 290 F.3d at 1047–50) (internal quotation marks omitted).  The Ninth Circuit has approved the use of lodestar cross-checks as a way of determining the reasonableness of a particular percentage recovery of a common fund.  *Vizcaino*, 290 F.3d at 1050 ("Where such investment is minimal, as in the case of an early settlement, the lodestar calculation may convince a court that a lower percentage is reasonable.  Similarly, the lodestar calculation can be helpful in suggesting a higher percentage when litigation has been protracted.").  The Ninth Circuit has permitted courts to award attorneys'

17

1    fees using this method "in lieu of the often more time-consuming task of calculating the lodestar."

2    *In re Bluetooth*, 654 F.3d at 942.

3         Where, as here, a lodestar is merely being used as a cross-check, the court "may use a

4    'rough calculation of the lodestar.'"  *Bond v. Ferguson Enters., Inc.*, No. 1:09-cv-1662-OWW-

5    MJS, 2011 WL 2648879, at *12 (E.D. Cal. June 30, 2011) (quoting *Fernandez v. Victoria Secret*

6    *Stores, LLC*, No. 06-cv-04149-MMM-SHx, 2008 WL 8150856 (C.D. Cal. July 21, 2008)).

7    Moreover, beyond simply the multiplication of a reasonable hourly rate by the number of hours

8    worked, a lodestar multiplier is often applied.  "Multipliers in the 3–4 range are common in

9    lodestar awards for lengthy and complex class action litigation."  *Van Vranken v. Atl. Richfield*

10   *Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995) (citing *Behrens v. Wometco Enters., Inc.*, 118 F.R.D.

11   534, 549 (S.D. Fla. 1988)); *see also* 4 Newberg on Class Actions § 14.7 (stating courts typically

12   approve percentage awards based on lodestar cross-checks of 1.9 to 5.1 or even higher, and "the

13   multiplier of 1.9 is comparable to multipliers used by the courts"); *In re Prudential Ins. Co. Am.*

14   *Sales Practice Litig. Agent Actions*, 148 F.3d 283, 341 (3d Cir. 1998) ("[M]ultiples ranging from

15   one to four are frequently awarded in common fund cases when the lodestar method is applied.")

16   (quoting 4 Newberg on Class Actions § 14.7).

17        Here, the settlement provides that class counsel will seek an award of one-third of the

18   gross settlement amount of $1.85 million, equivalent to $616,666.67.  (Doc. No. 58-1 at 10.)  The

19   court approved plaintiff's request for attorneys' fees on a preliminary basis but noted that it was

20   "not fully persuaded that the amount of fees requested is reasonable in this case, particularly in

21   light of counsel's repeated failure to provide the court with sufficient and accurate information

22   throughout this litigation, necessitating the issuance of an order to show cause and orders for

23   supplemental briefing to clarify inconsistencies."  (Doc. No. 70 at 3.)  The court cautioned that it

24   expected class counsel in plaintiff's motion for attorneys' fees to "address the reasonableness of a

25   fee award of 33.33% of the common fund in *this* case specifically—not just in similar

26   contingency-based, wage-and-hour class action settlements."  (*Id.* at 3–4.)  The court also

27   previewed that it would make a final determination on the reasonableness of the requested fee

28   amount by performing a lodestar cross-check.  (Doc. No. 63 at 6; 60 at 27.)

1    Ultimately, class counsel has not persuaded the court that the above-benchmark fee award

2    requested is supported by consideration of the factors that courts assess when determining the

3    reasonableness of a percentage fee award.  *See Laffitte*, 1 Cal. 5th at 504.  First, plaintiff did not

4    address the potential value of this litigation (maximum recovery, discounts applicable to account

5    for defenses, etc.) at all in the motion for final approval and motion for attorneys' fees.  Second,

6    counsel did not address the novelty, if any, of the issues involved in this case.  Third, although

7    counsel explain that recovery of their fees was contingent and this litigation involved risk (e.g.,

8    risk of appeals, risk of not prevailing on manageability issues for PAGA claim, risk of not

9    certifying the class, risk of damages calculation issues), counsel has not persuaded the court that

10   those risks were high or extreme compared to other similar cases.  In the court's view, while those

11   articulated risks certainly weighed in favor of settling the case, as the court noted above, those

12   risks alone do not necessarily justify an above-benchmark attorneys' fee award.  This is especially

13   true here, given that the parties participated in a meaningful and productive mediation in January

14   2020, when the case had only been pending for a year and before any motion practice had taken

15   place.  In fact, the first motion filed in this case by either plaintiff or defendants was the motion

16   for preliminary approval of their class action settlement.  Moreover, of the 337.65 hours[1] that

17   class counsel expended working on this case, the majority of those hours (215.35) were spent

18   performing work after the mediation, when presumably the prospect of settlement and recovery of

19   fees became more likely than not, thereby lessening the risk at that point.  Even if the results of

20   the mediation did not lessen the risks at that time, certainly by the time the parties filed their

21

---

22   [1]  The court notes that there is a discrepancy between the total number of hours stated in
     plaintiff's motion for attorneys' fees—379.4 hours (Doc. No. 72 at 21)—and the total number of

23   hours according to the billing records spreadsheet provided as Exhibit A to attorney Bradley's
     declaration—337.65 hours (Doc. No. 72-1 at 39).  This discrepancy is not explained by class

24   counsel intentionally reducing the number of hours, as both of these amounts took into account
     any reductions by class counsel in exercising billing judgment to winnow down the number of

25   hours.  (*See* Doc. Nos. 72-1 at ¶ 53 (attorney Bradley's declaration that Exhibit A consists of
     billing records "after removing all billing entries for paralegals/law clerks who contributed to the

26   case and exercising billing judgment to winnow down the hours"); 72 at 9 n.1, 21 (noting that
     class counsel's lodestar includes reductions for billing judgment)).  Because the billing records

27   substantiate the number of hours spent by class counsel on this action, the court will use 337.65 as
     the total number of hours, rather than the unsubstantiated 379.4 amount.

28

1    notice of settlement on March 12, 2020 the risks had dissipated to some extent.  (*See* Doc. No.

2    72-1 at 21–39.)  From March 12, 2020 through the filing of the pending motions on May 10,

3    2021, class counsel has expended 194.55 hours working on this case.  (*Id.*)  That is, more than

4    half of the hours class counsel expended on this case were spent performing work after the parties

5    had reached a settlement, which drastically diminished the risk of not recovering any attorneys'

6    fees.  Finally, class counsel merely assert in conclusory fashion that their "skill in prosecuting and

7    resolving this case is evidenced by the terms of the settlement they ultimately achieved" (Doc.

8    No. 72 at 25), but they do not describe any circumstances in which they showed particular skills

9    that would suggest the high attorneys' fee award requested by plaintiff here is reasonable.

10         In addition, the lodestar cross check—when properly calculated using reasonable hourly

11   rates and the number of hours worked according to class counsel's billing records—does not

12   suggest that a fee award of 33.33% is appropriate in this case.  Counsel assert that their lodestar is

13   approximately $299,250.00, and a fee award of $616,666.67 would result from application of a

14   multiplier of 2.06, which counsel assert is reasonable.  However, as noted above, counsel's

15   lodestar calculation is not based on an accurate number of hours according to the billing records

16   provided in Exhibit A to attorney Bradley's declaration.  Class counsel also calculate the lodestar

17   by applying hourly rates of $851.21 for partner Bradley, $740.61 for partner Grombacher, $600

18   for associate King, $775 for associate Joyner, and $700 for associate Emerson.  (Doc. No. 72-1 at

19   ¶ 53.)  But these rates are substantially higher than the hourly rates previously accepted by the

20   undersigned as reasonable.  *See, e.g.*, *Singh v. Roadrunner Intermodal Servs., LLC*, No. 1:15-cv-

21   01497-DAD-BAM, 2019 WL 316814, at *10 (E.D. Cal. Jan. 24, 2019) (accepting hourly rates of

22   between $330 and $550 for associates, and $500 and $720 for partners); *Mathein v. Pier 1*

23   *Imports (U.S.), Inc.*, No. 1:16-cv-00087-DAD-SAB, 2018 WL 1993727, at *11 (E.D. Cal. Apr.

24   27, 2018) (accepting hourly rates of between $475 and $575 for associates, and $675 and $750

25   for senior counsel and partners for lodestar cross-check purposes); *Emmons v. Quest Diagnostics*

26   *Clinical Labs., Inc.*, No. 1:13-cv-00474-DAD-BAM, 2017 WL 749018, at *8 (E.D. Cal. Feb. 27,

27   2017) (adopting as reasonable rates between $370 and $495 for associates and $545 and $695 for

28   senior counsel and partners).  If class counsel's lodestar in this case is calculated using the highest

20

1   of the previously court accepted hourly rates[2]—$750 for partner Bradley, $720 for partner

2   Grombacher, and $575 for associates King, Joyner, and Emerson—and those rates were

3   multiplied by the number of hours expended by each attorney according to the billing records in

4   Exhibit A, the total lodestar in would be $234,289.25.[3]

5            To reach the amount of $616,667.66 in fees that class counsel has requested here, a

6   multiplier of approximately 2.63 would have to be applied to the lodestar of $234,289.25, which

7   was calculated by employing some of the highest approved rates in this district.  While such a

8   multiplier may be perfectly appropriate in other cases, here, the court finds that such an attorneys'

9   fee award is not justified in this case given:  the relatively short duration of this litigation; the lack

10  of complexity in the issues involved; the quick settlement before any expenditure of resources on

11  motion practice and formal discovery; the fact that class counsel expended a majority of their

12  hours on this case after settlement, when the risk of non-payment of fees had diminished; and the

13  fact that class counsel has not demonstrated exceptional skills in this litigation as reflected by the

14  many unnecessary and confusing filings on the docket in this case.  The court instead finds that a

15  benchmark fee award of 25% of the Gross Settlement is fair and reasonable.  Twenty-five percent

16  of the gross settlement amount of $1.85 million yields an attorneys' fee award of $462,500.00.  A

17  further lodestar cross-check confirms that this amount reflects application of a 1.97 multiplier to

18  counsel's lodestar and is thus a reasonable award of attorneys' fees for class counsel in this case.

19           Accordingly, the court will grant plaintiff's motion for attorneys' fees and award

20  $462,500.00 in attorneys' fees, an amount equal to 25% of the total fund in this case.

21  **B.      Expenses of Class Counsel**

22           Additionally, class counsel seeks to recover the costs expended on this litigation.  Expense

23  awards "should be limited to typical out-of-pocket expenses that are charged to a fee paying client

24  _____

25  [2]  Since this hourly rate will be used solely for the purpose of cross-checking the percentage of
    the common fund awarded as attorneys' fees, the court need not define precisely the appropriate

26  rates for this district.

27  [3]  The court calculated the lodestar as follows:  Bradley (195.9 hours * $750) + Grombacher (40.4
    hours * $720) + King (50.15 hours * $575) + Joyer (36.5 hours * $575) + Emerson (14.7 hours *

28  $575) = $234,289.25.  (*See* Doc. No. 72-1 at 21–39.)

1   and should be reasonable and necessary." *In re Immune Response Secs. Litig.*, 497 F. Supp. 2d

2   1166, 1177 (S.D. Cal. 2007).  These can include reimbursements for:  "(1) meals, hotels, and

3   transportation; (2) photocopies; (3) postage, telephone, and fax; (4) filing fees; (5) messenger and

4   overnight delivery; (6) online legal research; (7) class action notices; (8) experts, consultants, and

5   investigators; and (9) mediation fees." *Id.*

6        Here, class counsel requests reimbursement of their actual expenses in the amount of

7   $8,763.80.  (Doc. No. 72 at 25–26.)  The court has reviewed class counsel's declaration and

8   attached transaction report itemizing the costs they incurred and finds all the expenses incurred to

9   be quite reasonable.  Accordingly, the court will approve their reimbursement of expenses in the

10  amount requested.

11  **C.   Incentive Award**

12       "Incentive awards are fairly typical in class action cases." *Rodriguez v. West Publ'g*

13  *Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009).  However, the decision to approve such an award is

14  a matter within the court's discretion.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th

15  Cir. 2000).  Generally speaking, incentive awards are meant to "compensate class representatives

16  for work done on behalf of the class, to make up for financial or reputational risk undertaken in

17  bringing the action, and, sometimes, to recognize their willingness to act as a private attorney

18  general." *Rodriguez*, 563 F.3d at 958–59.  The Ninth Circuit has emphasized that "district courts

19  must be vigilant in scrutinizing all incentive awards to determine whether they destroy the

20  adequacy of the class representatives . . . .  [C]oncerns over potential conflicts may be especially

21  pressing where, as here, the proposed service fees greatly exceed the payments to absent class

22  members." *Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) (internal

23  quotation marks and citation omitted).  A class representative must justify an incentive award

24  through "evidence demonstrating the quality of plaintiff's representative service," such as

25  "substantial efforts taken as class representative to justify the discrepancy between [her] award

26  and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal.

27  2008).  Incentive awards are particularly appropriate in wage-and-hour actions where a plaintiff

28  undertakes a significant "reputational risk" by bringing suit against their former employers.

22

1  *Rodriguez*, 563 F.3d at 958–59.  The district court must evaluate such awards individually, using

2  "relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class,

3  the degree to which the class has benefitted from those actions, . . . the amount of time and effort

4  the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace

5  retaliation."  *Staton*, 327 F.3d at 977 (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir.

6  1998)).

7          In the Ninth Circuit, courts typically find an incentive award of $5,000 to be

8  "presumptively reasonable."  *See, e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 457, 463

9  (9th Cir. 2000) (endorsing $5,000 service awards to named representatives); *Bellinghausen v.*

10  *Tractor Supply Co.*, 306 F.R.D. 245, 246 (N.D. Cal. 2015) (collecting cases); *In re Toys R Us-*

11  *Del., Inc. FACTA Litig.*, 295 F.R.D. 438, 470–72 (C.D. Cal. 2014) (awarding plaintiffs $5,000

12  each "consistent with the amounts courts typically award as incentive payments").  Higher

13  incentive award amounts can be appropriate, such as in employment actions, where a plaintiff

14  risks retaliation or blacklisting by bringing suit against her employer.  *See, e.g.*, *Buccellato v.*

15  *AT&T Operations, Inc.*, No. 10-cv-00463-LHK, 2011 WL 4526673, at *4 (N.D. Cal. June 30,

16  2011).

17          Here, plaintiff Perez filed a separate motion for an incentive award in the amount of

18  $10,000, in which he argues that such an award is warranted because he helped class counsel

19  bring about strong results for the class, he undertook considerable personal risk to serve as the

20  class representative, and he agreed to a broader release of claims than the unnamed class

21  members.  (Doc. No. 73 at 6.)  Plaintiff Perez submitted a declaration in which he explains that he

22  decided representing the class was the right thing to do despite the risks he faced, including that

23  "initiating the case could potentially hurt [his] future employment possibilities with another

24  employer because [he'd] be looked at as a troublemaker" and that "CVS might go after [him] for

25  litigation costs if it won the case against him." (Doc. No. 73-1 at ¶ 6.)  Plaintiff Perez asserts that

26  he deserves the requested service award because he chose to forego pursuing other potential

27  claims, such as a wrongful termination claim based on his termination for not meeting CVS's

28  productivity goals after he broke his collarbone, "so that he would not risk having a conflict with

1    the class members he would be representing," and he "remained committed to the class wage and

2    hour claims that he had in common with the other class members."  (Doc. No. 73 at 7.)

3        Plaintiff Perez also asserts that he has been an active participant in this case since he

4    contacted class counsel in the fall of 2018 to share his concerns about uncompensated time spent

5    undergoing security checks and has remained in close contact with class counsel, including many

6    phone calls, e-mails, and in-person meetings.  (*Id.*)  In particular, plaintiff Perez helped identify

7    other distribution center employees and reached out to them, "putting his reputation on the line,"

8    and he searched for relevant documents to provide his counsel and was interviewed extensively

9    by class counsel.  (Doc. No. 73-1 at ¶¶ 7–8.)  Although plaintiff Perez did not attend the day-long

10   mediation, he made himself available that day to answer questions and had provided his counsel

11   with estimates of the length of time he spent waiting for security checks, estimates which counsel

12   used to inform their damages analysis.  (*Id.* at ¶¶ 8–10.)  After the mediation, plaintiff Perez

13   continued to answer questions from class members who wanted to know about the status of the

14   settlement.  (*Id.* at ¶ 11.)  Plaintiff Perez does not estimate the number of hours he spent on this

15   litigation, though he characterizes the investment as "many hours of [his] personal time."  (*Id.* at

16   ¶ 15.)

17       In this case, a representative service award of $10,000 would represent 0.5% of the gross

18   settlement amount and would be approximately thirty-one times higher than the average gross

19   settlement payment of $315.67 and thirteen times higher than the highest gross settlement of

20   $768.41.  (*See* Doc. No. 71-1 ¶ 15.)  In the court's view plaintiff Perez has failed to provide

21   persuasive reasons as to why his requested incentive award should be approved given the

22   disparity between the requested amount and the settlement's average award to the class members.

23   In addition to this disparity, the court notes that unlike other cases in which the undersigned has

24   awarded incentive payments of $10,000 to class representatives, here plaintiff Perez did not sit for

25   a deposition and did not attend the mediation.  Under these circumstances, the court finds that

26   $7,500 is an appropriate amount for an incentive award for plaintiff Perez.  *See, e.g.*, *Martin v.*

27   *Sysco Corp.*, No. 1:16-cv-00990-DAD-SAB, 2019 WL 6894471, at *9 (E.D. Cal. Dec. 18, 2019)

28   (awarding $7,500 incentive payment where payments to class members averaged $1,999.86;

*Emmons*, 2017 WL 749018, at *9 (awarding $8,000 incentive payment where payments to class members averaged $550); *Cortez v. Vieira Custom Chopping, Inc.*, No. 1:17-cv-01647-DAD-SKO, 2020 WL 4369101, at *9 (E.D. Cal. July 30, 2020) (awarding $7,500 incentive payment where "[t]he average payment of class members will be $2,186, although the actual amount will vary depending on each class member's days and hours worked, and hourly rate of pay"); *cf. Ontiveros v. Zamora*, 303 F.R.D. 356, 366 (E.D. Cal. 2014) (concluding that "[i]n light of plaintiff's significant efforts, an award of $15,000 does not appear grossly disproportionate to the estimated average recovery of other individual class members of approximately $3,700, especially given that the highest pro rata settlement share is $14,358.92").

Accordingly, the court will grant plaintiff's motion for a service award but will award an incentive payment in the amount of $7,500 as that amount is fair and reasonable.

**D.    Settlement Administrator Costs**

The court previously approved the appointment of ILYM as the settlement administrator in this action.  (Doc. Nos. 70; 66 at 4.)  According to the declaration of Nathalie Hernandez, Operations Manager for ILYM, the total cost for administration of this settlement, including fees incurred and future costs for completion, is $30,000.00.  (Doc. No. 71-1 at ¶ 16.)  The court finds these administration costs reasonable and will direct payment in the requested amount.

**CONCLUSION**

For the reasons stated above:

1.    Plaintiff's motion for final approval of the class action settlement (Doc. No. 71) is
          granted, and the court approves the settlement as fair, reasonable, and adequate;

2.    Plaintiff's motion for an award of attorneys' fees and costs (Doc. No. 72) is
          granted;

3.    Plaintiff's motion for a class action representative incentive award (Doc. No. 73) is
          granted;

4.    The court awards the following sums:

          a.    Class counsel shall receive $462,500.00 in attorneys' fees and $8,763.80 in
                  expenses;

b. Plaintiff Perez shall receive $7,500.00 as an incentive payment;

c. ILYM Group, Inc., shall receive $30,000.00 in settlement administration costs; and

d. The parties shall direct payment of 75 percent of the settlement allocated to the PAGA payment, or $75,000.00, to the California Labor and Workforce Development Agency as required by California law, and the remainder of the PAGA payment, or $25,000.00, shall be included in the net settlement fund;

5. The parties are directed to effectuate all terms of the settlement agreement and any deadlines or procedures for distribution set forth therein;

6. This action is dismissed with prejudice in accordance with the terms of the parties' amended settlement agreement, with the court specifically retaining jurisdiction over this action for the purpose of enforcing the parties' settlement agreement; and

7. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated: __**June 11, 2021**__    _____

              UNITED STATES DISTRICT JUDGE